UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DONTAVIAS HAYNES,

    Plaintiff,

    v.

ANTHONY HEDGPETH, et al.,

    Defendants.

Case No. 12-cv-00363-JST (PR)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; STAYING ACTION AND REFERRING FOR SETTLEMENT PROCEEDINGS; DIRECTIONS TO CLERK**

Re: Dkt. No. 60

Plaintiff, a California prisoner proceeding pro se and currently incarcerated at Salinas Valley State Prison ("SVSP"), filed the instant civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Defendants violated his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the First Amendment's Free Exercise Clause, and the Fourteenth Amendment's Equal Protection Clause by not providing him with Friday Jumu'ah prayer services. Now before the Court is Defendants' motion for summary judgment. Plaintiff did not file any opposition to the motion, and the deadline by which to do so has passed.[1] For the reasons discussed below, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

//

//

//

---

[1] Plaintiff requested, and the Court granted, a 30-day extension of time to file his opposition. Docket Nos. 66 and 67. With the extension of time, Plaintiff's opposition was due October 10, 2014. Docket No. 67.

# FACTUAL BACKGROUND[2]

## A. Prison Staff Reduction and Redirection Plan (June 2010 – July 2011)

During the fiscal year from June 2010 to July 2011, various SVSP staff positions were not filled due to the severe state budget crisis. The ensuing overall shortage of correctional officers meant that on certain yards there were insufficient correctional officers to run the normal programming (e.g., yard, dayroom, religious services) and simultaneously maintain safety and security. Docket No. 64 ("Hatton Decl."), ¶ 4. Rather than have irregular interruptions with the prison programs, CDCR requested that staff be redirected to different yards on different days to ensure that no one prison yard suffered interruption to normal programming for an extended period of time. Id., ¶ 5. Then-Warden of SVSP, Defendant Anthony Hedgpeth, initiated a 3% and 5% Redirection Plan ("Redirection Plan"), whereby correctional officers and supervisors were redirected from their regular posts to fill staff vacancies on other yards on certain days. Id., ¶¶ 4–5 and Ex. B.

Under the Redirection Plan, staff was redirected from Facility B every Friday. Hatton Decl., ¶ 6. As a result, inmate movement was restricted on Facility B on Fridays. Inmates were not allowed out of their cells except for medical and mental health care appointments; were not permitted to attend yard; and were not allowed to attend group worship. Id., ¶¶ 7–8. For group worship to take place, a yard officer must supervise inmates crossing the yard to access the chapel, and, because the chaplain is not a correctional officer, a correctional officer must supervise the group worship by standing outside the chapel door. Id., ¶ 8. Supervision is necessary because there are security risks associated with allowing inmates to attend group worship services unsupervised, including inmate violence, bartering of contraband, communication of gang orders, and passing of weapons. Id., ¶ 8. On Fridays, Facility B was staffed with only one floor officer and one control-booth officer for each building; two medical escort officers; and one sergeant. Id., ¶ 6. These officers could not be redirected to supervise the yard and the chapel. Control-booth officers could not be redirected because they monitor the ingress and egress of all movement

---

[2] The facts are undisputed unless otherwise noted.

1  throughout the unit.  Medical escort officers could not be redirected because they escort inmates to
2  medical appointments, which could not be cancelled due to the potential risk to inmate health and
3  safety.  Id.

4  The dates and times of staff reassignment under the Redirection Plan were chosen to
5  accommodate staffing schedules and programming expectations.  Docket No. 1 at 13.  The
6  Redirection Plan accommodated mandatory staff trainings, which were held on the first Monday
7  and the third Friday of each month.  Id.  Religious religious services were conducted seven days a
8  week, so it was inevitable that accommodating staff training would impact some religious group.
9  Id.  As an accommodation, Muslim services were being conducted on Wednesdays and Thursdays
10 under normal circumstances.  Id.

11 Defendants do not dispute that the Redirection Plan, as applied to Facility B, only
12 impacted Muslims.  Inmates of other religious faiths housed in Facility B were able to continue
13 group worship in the chapel under normal circumstances.  Defendants claim, however, that the
14 rotating schedule of program modifications under the Redirection Plan equally affected all SVSP
15 inmates.

16 **B.    Inmate Riots and Modified Programs (June 23, 2010 – February 9, 2012)**

17 Prison staff typically institute a modified program after instances of mass violence.  A
18 modified program significantly restricts inmate mobility and programming: inmates are escorted
19 by correctional officers at all times when they move about the prison; inmates eat all meals in their
20 cells instead of the dining halls; most or all programming is cancelled; dayroom and outdoor
21 recreational activities are cancelled; and religious services can be either cancelled or restricted to
22 in-cell worship.  Hatton Decl., ¶ 9.  Medical and health appointments are not cancelled.  Id., ¶ 11.

23 Modified programs must be approved by the warden or his designee.  Hatton Decl., ¶ 9.
24 Prison staff strive to limit the inmates affected by the modified program and the duration of a
25 modified program.  Id., ¶ 10.  Modified programs assist in maintaining prison security in three
26 ways: (1) inmate movement is restricted, reducing the likelihood of additional violence; (2) they
27 provide a cooling-off period for the involved inmates and their allies; and (3) they allow staff to
28 conduct searches and interviews.  Id., ¶ 10.  After searches and interviews have been completed,

3

programming is phased back in through a process called "incremental release" whereby a handful of inmates are released to the yard each day. Id., ¶ 12. If fights break out, all inmates are returned to their cells and a cooling-off period of several days or longer is put into place during which no inmates are allowed in the yard. Id., ¶ 12. Incremental release begins again after the cooling-off period. Id., ¶ 12.

From June 2010 through January 2012, there were numerous instances of prisoner riots in Facility B. As a result, during this time, some or all of the inmates housed in Facility B were placed on a modified program. On June 23, 2010, two riots between black inmates and northern Hispanic inmates occurred simultaneously in two buildings on Facility B. Hatton Decl., ¶ 13. At least 26 inmates were involved and several suffered serious injuries. Several inmate-manufactured weapons were discovered after the riots ended. Id. The violence included non-gang affiliated inmates of each ethnic or racial group. Id. In response, Warden Hedgpeth approved a modified program for all inmates in Facility B. Hatton Decl., ¶ 13 and Ex. D. Under the modified program, religious services were limited to in-cell worship. Hatton Decl., Ex. D. On September 8, 2010, prison staff started incremental releases of black and Northern Hispanic inmates. Hatton Decl., ¶ 14 and Exs. F and G. That same day, a riot occurred between two black inmates and two Northern Hispanic inmates. Id., Ex. G. It was not until November 3, 2010 that black inmates returned to normal programming. Id., Ex. E. Northern Hispanic inmates remained on the modified program. Id.

On January 20, 2011, during an incremental release of northern Hispanic inmates, another riot ensured. Hatton Decl., ¶ 15 and Ex. E. Consequently, all incremental releases were rescinded and Warden Hedgpeth approved a modified program for black and northern Hispanic inmates in Facility B. Id. Under the modified program, religious services were limited to in-cell worship. Hatton Decl., Ex. E.

On May 11, 2011, all black inmates resumed normal programming while northern Hispanic inmates remained on the modified program. Hatton Decl., ¶ 16 and Ex. F. On or about July 21, 2011, prison staff received information of a credible threat to Facility B. Warden Hedgpeth approved a modified program for all inmates to facilitate searches and interviews. Id.,

4

¶ 17 and Ex. G. On August 9, 2011, incremental releases began. Id., ¶ 18. However, within fifteen minutes after the inmates' release to the yard, northern Hispanic inmates attacked black inmates. Id. As a result, Warden Hedgpeth approved a modified program for Northern Hispanic inmates and normal programming was resumed for all other inmates. Id., ¶ 18 and Ex. H.

On November 2, 2011, Northern Hispanic inmates attacked black inmates during an incremental release. Northern Hispanics inmates were placed on a modified program. Hatton Decl., ¶ 19. On December 15, 2011, during incremental releases, another riot occurred between Northern Hispanic and black inmates. Warden Hedgpeth approved a modified program for black and Northern Hispanic inmates. Hatton Decl., ¶ 20 and Ex. I.

On December 21, 2011, all inmates, except black inmates, began incremental releases, because prison staff had not yet interviewed the black inmates. Hatton Decl., ¶ 21 and Ex. J. On January 19, 2012, incremental release began for all inmates and was completed by February 9, 2012, resulting in the resumption of normal programming for all Facility B inmates. Hatton Decl. ¶ 22 and Ex. K.

The modified programs instituted between June 23, 2010 and February 9, 2012 prohibited group worship for either all inmates or for inmates of certain racial/ethnic groups. The group worship restriction was not based on an inmate's religious faith.

**C.     Plaintiff's Religious Faith and Access to Friday Group Jumu'ah Prayers**

Plaintiff is a black male and a devout Muslim practitioner of the Islamic faith. Docket No. 46 at 1, 3. Muslims pray five times daily. Docket No. 62 ("Lawal Decl.") at ¶ 5. This prayer may be performed by the practitioner alone. Id. On Friday afternoons, the Muslim religious practice requires adherents to attend the Jumu'ah prayer. Docket No. 46 at 3. The Jumu'ah prayer is a congregational prayer, consisting of a sermon by the imam followed by two units, or prayers, together with the congregation. Lawal Decl., ¶ 5.

Since 1997, SVSP has provided inmates access to the chapel in their facility for group worship. Docket No. 62 ("Hernandez Decl.") at ¶ 6. Access to the chapel requires passing through the yard. Id. Inmates who are Muslims of the Islamic faith hold Jumu'ah prayer services in the chapel on Fridays. Docket No. 46 at 5. On Saturdays, Native American inmates have

access to chapel and to their special sweat lodges for their worship services.  Id.  Catholic, Protestant, and other Christian inmates hold worship services in the chapel on Sundays.  Docket No. 46 at 4.

Between May 20, 2010 and June 26, 2013, Plaintiff was housed in SVSP Facility B. Docket No. 64 ("Hatton Decl.") at ¶ 2, Ex. A.  From June 26, 2013 to July 3, 2013, Plaintiff was housed in SVSP Facility C.  Hatton Decl., Ex. A.  On July 3, 2013, Plaintiff was moved to SVSP Facility D, where he is currently housed.  Id.

Plaintiff states that beginning in December 2010 and continuing through October 2013 (the date of the filing of the First Amended Complaint ("FAC") in this case), all Muslim inmates housed in Facility B were denied access to the chapel on Fridays and therefore unable to participate in group Jumu'ah prayer services.  Docket No. 46 at 7 and 11.  Defendants dispute this statement.  Defendants provide prison records that show that Friday Jumu'ah prayer services were offered in Facility B's chapel five times in May 2011, once in August 2011, and three times in November 2011.  Docket No. 62 ("Hernandez Decl."), ¶ 4 and Ex. A.  Attendance records for these services show that Plaintiff attended four of the five prayer services offered in May; the one prayer service offered in August; and two of the three prayer services offered in November.  Id. However, Defendants are unable to locate any other records documenting whether Friday Jumu'ah prayer services were offered in Facility B in the other months of 2011, and in 2012 and 2013. Hernandez Decl., ¶ 4.

From April 2012 to August 2013, the position of Islamic chaplain at SVSP was vacant. Hernandez Decl., ¶ 6.  Muhammed Lawal was hired as SVSP Islamic chaplain in August 2013. Id.  He resumed Muslim services for all SVSP inmates in August 2013.  Id., ¶ 8.  Since August 2013, Chaplain Lawal has administered Friday Jumu'ah prayer services on the 1st, 3rd, and 5th Friday of each month to inmates housed in the A and B facilities, and on the 2nd and 4th Friday of each month to inmates housed in the C and D facilities.  Lawal Decl., ¶ 6.  Since January 2014, Friday Jumu'ah prayer services have been available to Plaintiff in Facility D and Plaintiff has consistently attended.  Lawal Decl., ¶ 8 and Ex. A.

//

6

**D.     Plaintiff's Grievances Regarding the Lack of Friday Jumu'ah Services**

On or about January 16, 2011, Plaintiff asked defendant Sergeant Parsons why only Muslims, and not Christians, Catholics, Protestants, or Native Americans, were being denied access to the chapel for their group prayers.  Docket No. 46 at 8.  Plaintiff claims that defendant Parsons informed him that the officer covering the chapel had been re-assigned on Fridays to another position.  Id.  On or about February 10, 2011, Plaintiff discussed with defendant Captain Hatton the denial of access to the chapel for Friday Jumu'ah services.  Docket No. 46 at 9.  Plaintiff claims that Defendant Hatton also informed him that the officer covering the chapel had been re-assigned on Fridays to cover another position.  Plaintiff further claims that defendant Hatton informed him that the Defendants (with the exception of G. J. Giuirbino, the SVSP Director of Adult Operations) had agreed that the Redirection Plan would work best with the re-assignment on Fridays of the officer covering the chapel.  Id.

On or about February 28, 2011, Plaintiff spoke telephonically with defendant Medina about his concerns regarding denial of access to the chapel on Fridays.  Docket No. 46 at 10.  Plaintiff claims that defendant Medina also stated that Defendants agreed that the Redirection Plan operated better with the Friday re-assignment of the officer covering the chapel.  Plaintiff further claims that when he asked defendant Medina to have the officer reassigned on a different day, Medina refused "because such re-scheduling would conflict with and deny Native Americans, or Christians, Catholics, or Protestants, access to the chapel on their weekly holy day of Saturday or Sunday."  Id.  That same day, Plaintiff submitted a CDC Form GA-22 (Inmate/Parolee Request for Interview) to defendant Hedgpeth requesting modification of the Redirection Plan to allow access to the chapel for Friday Jumu'ah prayer services.  Id.  Plaintiff alleges that defendant Solis responded on behalf of defendant Hedgpeth and stated that defendant Hedgpeth would not change the Redirection Plan "because it would conflict with and deny Native Americans, Christians, Catholics and Protestants inmates their worship rights on their weekly holy days on Saturday and Sunday, if the chapel officer were re-assigned to cover another job duty on those days instead of Fridays."  Id.  Plaintiff also alleges that defendant Solis stated that defendant C.J. Giuirbino helped defendant Hedgpeth formulate and implement the Redirection Plan.  Id.

7

1          Defendants deny that the Redirection Plan was structured to protect the "worship rights" of
2   Native American, Christians, Catholics, and Protestants. Defendants informed Plaintiff that the
3   Redirection Plan was accommodating the mandatory staff meetings held on the first Monday and
4   third Friday of each month. Docket No. 1 at 13–19. In addition, Defendants informed Plaintiff
5   that because religious services were held on every day of the week, the Redirection Plan would
6   inevitably conflict with a religious group's use of the chapel. Id. During the Redirection Plan,
7   services were being held on Wednesdays and Thursdays as an accommodation. Id.

## DISCUSSION

### A.  Standard of Review

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See id.

The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" See id. at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv., Inc., v. Pacific Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987). A verified

1  complaint may be used as an opposing affidavit under Rule 56, provided it is based on personal
2  knowledge and sets forth specific facts admissible in evidence.  See Schroeder v. McDonald, 55
3  F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing
4  affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated,
5  under penalty of perjury, contents were true and correct, and allegations were not based purely on
6  information and belief but rather on personal knowledge).  Here, Plaintiff's verified first amended
7  complaint is considered in opposition to the motion for summary judgment.

**B.     Analysis**

Plaintiff brings suit against Warden Hedgpeth, Deputy Warden Solis, Captain Hatton, Sergeant Parsons, Administrator Medina, Lieutenant Gifford, and Adult Operations Director G. J. Giuirbino, "jointly and severally in their personal capacity while acting under color of law." Docket No. 46 at 2.  Because Plaintiff is proceeding pro se, the Court interprets his claims liberally as against Defendants in both their individual and official capacity.  See Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 623 (9th Cir. 1998) ("the court must construe [pro se] pleadings liberally and must afford plaintiff the benefit of any doubt").  Plaintiff claims Defendants' failure to provide him with Friday Jumu'ah prayer services violates his constitutional rights under RLUIPA, the Free Exercise Clause of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment.  He seeks compensatory and punitive damages, as well as injunctive relief.

As an initial matter, the Court notes that the relevant time period is December 2010 through June 26, 2013, the date Plaintiff was moved out of Facility B.  The Court views the facts in the light most favorable to Plaintiff in evaluating Defendants' motion for summary judgment. The Court assumes that Friday Jumu'ah prayer services were not available to Facility B Muslim inmates if Defendants are unable to provide evidence to the contrary.  Sign-in sheets establish that Jumu'ah prayer services were offered in 2011 on the following dates: May 18, 19, 25, 26, and 27; August 12; and  November 10, 16 and 18.  Declarations from Chaplain Lawal and Community Resources Manager Hernandez attest to the resumption of regular Jumu'ah prayers starting in August 2013.

Accordingly, the Court takes the following as having been established for purposes of this motion: Group religious services have always been available to inmates of non-Muslim faiths except during modified programs. Restrictions on access to the Facility B chapel prevented Muslim inmates from engaging in Friday group worship during the following time periods: December 2010 through May 11, 2011; May 28, 2011 through August 11, 2011; August 13, 2011 through November 9, 2011; and February 9, 2012 through June 26, 2013.

Defendants argue that any failure to allow Muslim group worship between June 2010 and July 2011 was due to either the Redirection Plan implemented in 2010 in response to a severe budget crisis or due to modified programs instituted in response to inmate violence. Defendants argue that the modified program was also necessary during the following time periods: July 21, 2011 through August 9, 2011 and December 15, 2011 though February 9, 2012. During the modified programs, inmates were prohibited from attending group worship services based on their racial/ethnic group and not their faith. Defendants do not address why Friday Jumu'ah prayer services were not provided during the following time periods: August 19, 2011 to November 9, 2011; November 25, 2011 to December 14, 2011; and February 9, 2012 – June 26, 2013.

### 1. RLUIPA

Congress enacted RLUIPA pursuant to its Spending Clause and Commerce Clause authority. Sossman v. Texas, 131 S. Ct. 1651, 1656 (2011). Under RLUIPA, government institutions that receive federal funding are prohibited from imposing a substantial burden on religious exercise of persons confined in institutions unless that burden is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000cc–1(a). RLUIPA authorizes private citizens to bring suit against a government for violations of RLUIPA and to obtain appropriate relief. 42 U.S.C. § 2000cc-2(a).

Plaintiff's RLUIPA claim fails because the relief he seeks is unavailable. Under the principle of Eleventh Amendment sovereign immunity, money damages under RLIUPA are not available against a state or state employees acting in their official capacity. Sossman, 131 S. Ct. at 1658–60. And, "[f]or sovereign-immunity purposes, we treat [a] suit against state officials in their official capacities as a suit against the state." Holley v. Cal. Dep't of Corrections., 599 F.3d 1108,

1111 (9th Cir. 2010).  Nor can Plaintiff seek injunctive relief since he is currently receiving Friday Jumu'ah prayer services.  In addition, RLUIPA does not authorize suits against state actors acting in their individual capacity.  Wood v. Yordy, 753 F.3d 899, 904 (9th Cir. 2014).  Finally, Plaintiff's claims for injunctive relief do not fall into the recognized exception to moot claims for cases which are "capable of repetition, yet evading review."  Roe v. Wade, 410 U.S. 113, 125 (1973). To fit within this exception, Plaintiff must show he is realistically threatened by a repetition of the violation, and that absent court-ordered injunctive relief preventing the harm, he will be subject to immediate and irreparable future injury.  City of Los Angeles v. Lyons, 461 U.S. 95, 109, and 111 (1983).  Plaintiff has not made such a showing.  Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiff's RLUIPA claim.

### 2. Free Exercise Clause of the First Amendment

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend I.  "The first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state.  The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people."  Cutter v. Wilkinson, 544 U.S. 709, 719 (2005).  The free exercise right is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security.  See O'Lone v. Shabazz, 482 U.S. 342, 348–49 (1987).  In order to establish a free exercise violation, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate penological interests.  See Shakur v. Schriro, 514 F.3d 878, 883–84 (9th Cir. 2008).

The parties do not dispute that Plaintiff had a sincerely held religious belief in the need for participation in Jumu'ah group prayers on Fridays.  The Court therefore turns to the question of whether the denial of access to these group religious services was reasonably related to legitimate penological interests.  See O'Lone, 482 U.S. at 349 (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).

The Supreme Court has identified four factors for courts to consider when determining

whether a regulation or practice is reasonably related to legitimate penological interests:

(1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "'exaggerated response' to prison concerns." Turner, 482 U.S. at 89–90. The task in considering the Turner factors is not to balance the four factors, but, rather, to determine whether the state shows a "reasonable" relation between the policy and legitimate penological objectives, as opposed to simply a "logical" one. Beard v. Banks, 548 U.S. 521, 533 (2006). While all justifiable inferences must be drawn in the non-movant prisoner's favor with respect to matters of disputed fact, the Court's inferences must accord deference to the views of prison authorities in disputed matters of professional judgment. See id. at 529–30. Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. Id. at 530.

Defendants argue that the refusal to allow Muslim group worship was due to either the Redirection Plan or modified programs instituted by the warden. The Redirection Plan was implemented in 2010 in response to a severe budget crisis. Modified programs are instituted in response to inmate violence. Both the Redirection Plan and the modified program seek to ensure prison security and inmate safety, which are legitimate penological interests. Prison security is a compelling government interest, see Cutter, 544 U.S. at 725 n.13 (2000), and protecting inmate safety is required under the Eighth Amendment, see Farmer v. Brennan, 511 U.S. 825, 832 (1994).

With respect to the first Turner factor, the undisputed evidence shows a rational and valid connection between the unavailability of Friday Jumu'ah prayer services and prison security and inmate safety. The undisputed evidence is that prison officials initially implemented a modified program for all inmates in response to a riot in June 2010 that involved inmates of all racial groups. There were attempts to resume normal programming throughout the fall of 2010, but the

1  reoccurrence of riots in September 2010, January 2011, and August 2011, resulted in a modified
2  program for all or some racial groups, depending on who was involved in the riots. During the
3  modified program, affected inmates were subject to various restrictions, including in-cell worship.
4  The elimination of group worship services for affected inmates limited the security risks
5  associated with inmates gathering in a group, including inmate violence, contraband bartering,
6  communication of gang orders, and passing of weapons. Similarly, the undisputed evidence is that
7  a severe state budget crisis resulted in a shortage of correctional officers that required a staff
8  redirection plan to maintain prison safety and security.

Restricting inmates to in-cell worship following riots and refusing to allow group worship on Facility B when there were insufficient correctional officers to supervise inmate traffic across the yard and the group prayer services in the chapel is reasonably related to prison security. To the extent that Plaintiff did not have access to group worship services due to either the modified programs or the Redirection Plan, the first Turner factor weighs in favor of finding that the restriction was reasonably related to a legitimate penological need.

The second Turner factor is "whether there are alternative means of exercising the right that remains open to other inmates." Turner, 482 U.S. at 90. During the Redirection Plan, Plaintiff had the option to worship alone in his cell or attend group worship services on Wednesday and Thursday. During modified programs, Plaintiff could worship alone in his cell. The denial of access to group religious services did not deprive Plaintiff of all means of exercising his religious beliefs. See O'Lone, 482 U.S. at 352–53 (although there were no alternative means for the prisoners on work detail to attend Jumu'ah services, the prisoners nevertheless retained their ability to participate in other Muslim religious ceremonies and practices, and that ability supported the reasonableness of the restriction). This second factor also weighs in favor of finding that the restriction was reasonably related to a legitimate penological need.

The third Turner factor requires the Court to consider the "impact accommodation of the asserted constitutional right will have on guards and inmates, and on the allocation of prison resources generally." Turner, 482 U.S. at 90. Allowing Plaintiff to attend group worship services during modified programs defeats the purpose of modified programs. In order to stem prison

1  violence, modified programs prohibit group activities for inmates affiliated with those who have
2  recently rioted.  Accommodating Plaintiff's asserted constitutional right during modified programs
3  would negatively impact guards and inmates by undermining prison safety.  With respect to the
4  Redirection Plan, allowing Plaintiff to attend group worship would require that Facility B staff be
5  redirected on a different day.  Since there are religious services conducted every day of the week,
6  it is likely that inmates of a different religious faith would be negatively affected.  Redirecting
7  Facility B staff on a different day would also impact the prison staff's ability to attend one of the
8  two monthly trainings.  However, there is no evidence that the training could not have been re-
9  scheduled for a different day without negatively impacting prison operations.  The third Turner
10 factor weighs in favor of Defendants with respect to modified programs, but not with respect to
11 the Redirection Plan.

12 The fourth Turner factor requires the Court to consider whether there is an "absence of
13 ready alternatives" to the prison policy.  Turner, 482 U.S. at 90.  The absence of ready alternatives
14 is evidence of the reasonableness of a prison regulation.  Id.  The burden is on the prisoner
15 challenging the regulation to show that there are obvious, easy alternatives to the regulation.  See
16 O'Lone, 482 U.S. at 350; see also Mauro v. Arpaio, 188 F.3d 1054, 1062 (9th Cir. 1999).  Plaintiff
17 has not identified any alternatives to the regulation.  In fact, he insists that there are no alternatives
18 to group worship services on Fridays.  This weighs in favor of finding that cancelling Friday
19 Jumu'ah prayer services under the Redirection Plan or during a modified program was reasonable.

20 Having considered the various Turner factors, the Court concludes that to the extent that
21 Friday Jumu'ah prayer services were unavailable due to either the Redirection Plan or the
22 modified programs, this restriction was reasonably related to the legitimate penological goal of
23 inmate and staff safety.

24 However, the Court finds that Plaintiff has raised a triable issue of fact regarding whether
25 his right to free exercise of religion was improperly impinged upon by Defendants when they
26 failed to allow Friday Jumu'ah prayer services during the following time periods: August 19, 2011
27 to November 9, 2011; November 25, 2011 to December 14, 2011; and February 9, 2012 to June
28 26, 2013.  Defendants have provided no reason as to why group worship services were not

provided during that time. To the extent that Defendants are claiming that the lack of group Jumu'ah prayers from April 2012 to June 26, 2013 was due to the lack of an Islamic chaplain,[3] Defendants have not argued, much less proven, that there is a reasonable relation between the lack of an Islamic chaplain and the refusal to allow Friday Jumu'ah prayer services.

In summary, with respect to Plaintiff's free exercise claim, the Court grants in part and denies in part Defendants' summary judgment motion. To the extent that Friday Jumu'ah prayer services were cancelled due to modified programs or the Redirection Plan, the Court finds that Defendants did not violate Plaintiff's right to free exercise. However, the Court denies Defendants' motion for summary judgment with respect to the lack of Friday Jumu'ah prayer services from August 19, 2011 to November 9, 2011; November 25, 2011 to December 14, 2011; and February 9, 2012 to June 26, 2013.

### 3. Equal Protection Clause of the Fourteenth Amendment

The Equal Protection Clause requires that an inmate who is an adherent of a minority religion be afforded "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts," Cruz v. Beto, 405 U.S. 319, 322 (1972) (Buddhist prisoners must be given opportunity to pursue faith comparable to that given Christian prisoners), as long as the inmate's religious needs are balanced against the reasonable penological goals of the prison, O'Lone, 482 U.S. at 349. The court must consider whether "the difference between the defendants' treatment of [the inmate] and their treatment of [other] inmates is 'reasonably related to legitimate penological interests.'" Shakur, 514 F.3d at 891 (citation omitted) (finding district court erroneously applied rational basis review to plaintiff's claim that defendants violated equal protection clause by providing only Jewish inmates with kosher meat diet and remanding claim so record could be more fully developed regarding

---

[3] The following statements by Defendants imply that Jumu'ah services are not offered when a chaplain is unavailable to conduct the services: "Because the chaplain is not a peace officer, it is necessary for at least one correctional officer to stand outside the chapel door to supervise group worship, by standing outside the chapel door." Hatton Decl., ¶ 8. "[Muhammad Lawal] was approved by the Personnel Department [for the position of Islamic chaplain], and assumed his position in August of 2013. He immediately resumed Muslim services for all inmates at SVSP." Hernandez Decl., ¶ 8.

15

defendants' asserted penological interests). An inmate "'must set forth specific facts showing a genuine issue' as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths" and that "officials intentionally acted in a discriminatory manner." Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997), overruled in part by Shakur, 514 F.3d at 884–85. See, e.g., Hartman v. California Dep't of Corrections and Rehabilitation, 707 F.3d 1114, 1124 (9th Cir. 2013) (affirming dismissal of equal protection claim based on denial of request for a paid Wiccan chaplain where pleadings suggested a reasoned and vetted denial – paid Wiccan chaplain not necessary because a volunteer Wiccan chaplain provides services at prison and staff chaplains are available to provide inmates with religious assistance – rather than discriminatory intent).

Although prisoners are entitled to equal protection, it does not follow that a prison must duplicate every religious benefit it provides so that all religions are treated exactly the same. As the Supreme Court explained in Cruz:

> We do not suggest . . . that every religious sect or group within a prison – however few in number – must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty.

Cruz, 405 U.S. at 322 n.2. Application of the Cruz standard does not require "strict numerical analysis" or "create a system of ratios or quotas." Thompson v. Commonwealth of Ky., 712 F.2d 1078, 1081 (6th Cir. 1983) (upholding grant of summary judgment in favor of prison officials on Muslim inmates' request for access to chapel comparable to Christian inmates). It does require that the prison make a good faith accommodation in light of practical considerations. See Freeman, 125 F.3d at 737; Thompson, 712 F.2d at 1082 (court should scrutinize the prison officials' conduct to determine whether they deliberately discriminated against the minority religion or abused their discretion in distributing the prisons' limited resources).

Prison officials' failure to offer Friday Jumu'ah prayer services due to a modified program does not violate the Equal Protection Clause because inmates of all religious faiths were equally

affected by the modified program. All religious programming was restricted to in-cell worship only. Hatton Decl., Exs. D, E, F, G, I, J, K.

Prison officials' failure to offer Friday Jumu'ah prayer services due to the Redirection Plan, however, raises a triable issue of material fact as to whether defendants violated the Equal Protection Clause, because only Muslim inmates were affected. Moreover, Plaintiff has set forth facts showing a genuine issue as to whether prison officials intentionally acted in a discriminatory manner in choosing to redirect Facility B staff on Fridays. Freeman, 125 F.3d at 737. Plaintiff claims that Defendants Medina and Gifford informed him that they would not consider redirecting Facility B staff on another day because it would conflict with group worship services for Native Americans, Catholics, Christians, and Protestants. Docket No. 46 at 10. Although Defendants argue that the Redirection Plan sought to accommodate mandatory staff training meetings, they do not explain why Facility B staff could not have been redirected on a different day.

However, prison officials' failure to offer Friday Jumu'ah prayer services during the following time periods – August 19, 2011 to November 9, 2011; November 25, 2011 to December 14, 2011; and February 9, 2012 to June 26, 2013 – does not violate the Equal Protection Clause. Defendants are silent as to why there were no Friday Jumu'ah prayer services during the above-mentioned time periods and Plaintiff has not set forth any facts showing a genuine issue as to whether prison officials were intentionally acting in a discriminatory manner. The FAC focuses solely on the discriminatory impact of the Redirection Plan. However, the Redirection Plan ended in July 2011. Plaintiff makes no allegations regarding prison officials' intent in failing to provide Friday Jumu'ah prayer services from August 19, 2011 to November 9, 2011; November 25, 2011 to December 14, 2011; and February 9, 2012 to June 26, 2013.

In summary, with respect to Plaintiff's equal protection claim, the Court grants in part and denies in part Defendants' summary judgment motion. To the extent that Friday Jumu'ah prayer services were cancelled due to modified programs, the Court finds that Defendants did not violate Plaintiff's equal protections rights. The Court also finds that the failure to provide Friday Jumu'ah prayer services from August 19, 2011 to November 9, 2011; November 25, 2011 to December 14, 2011; and February 9, 2012 to June 26, 2013, did not violate the Equal Protection Clause because

1 Plaintiff has not set forth any facts showing a genuine issue as to whether prison officials were
2 intentionally acting in a discriminatory manner. However, the Court denies Defendants' motion
3 for summary judgment with respect to the lack of Friday Jumu'ah prayer services cancelled solely
4 due to the Redirection Plan.

## CONCLUSION

1. For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiff's remaining free exercise claim challenges the denial of Friday Jumu'ah prayer services from August 19, 2011 to November 9, 2011; November 25, 2011 to December 14, 2011; and February 9, 2012 to June 26, 2013. Plaintiff's remaining equal protections claim challenges the denial of Friday Jumu'ah prayer services due solely to the Redirection Plan.

2. The case is hereby REFERRED to Magistrate Judge Nandor Vadas for settlement proceedings. Such proceedings shall take place within 120 days of the date this order is filed, or as soon thereafter as Magistrate Judge Vadas's calendar will permit. Magistrate Judge Vadas shall coordinate a place, time, and date for one or more settlement conferences with all interested parties and/or their representatives and, within fifteen days of the conclusion of all settlement proceedings, shall file with the Court a report thereon.

The Clerk is directed to send Magistrate Judge Vadas a copy of this order.

3. The instant case is STAYED pending the settlement proceedings. The Clerk shall ADMINISTRATIVELY CLOSE this case until further order of the Court.

This order terminates Docket No. 60.

**IT IS SO ORDERED.**

Dated: March 12, 2015

_____
JON S. TIGAR
United States District Judge